In the

# United States Court of Appeals

### For the Seventh Circuit

_____

Nos. 06-3942 & 06-4032

SOMPO JAPAN INSURANCE, INC., as subrogee of
HITACHI DATA SYSTEMS CORPORATION,

*Plaintiff-Appellee*,
*Cross-Appellant*,

*v.*

NIPPON CARGO AIRLINES COMPANY, LIMITED,

*Defendant-Appellant*,
*Cross-Appellee*.

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 9311—**Joan Humphrey Lefkow**, *Judge*.

_____

ARGUED SEPTEMBER 17, 2007—DECIDED APRIL 11, 2008

_____

Before FLAUM, RIPPLE and WOOD, *Circuit Judges*.

RIPPLE, *Circuit Judge*.  Sompo Japan Insurance, Inc.
("Sompo"), as an insurer subrogated to the rights of
Hitachi Data Systems Corporation ("HDS"), brought this
action against Yusen Air and Sea Service Company
("Yusen"), Nippon Cargo Airlines ("NCA") and Pace Air

Freight ("Pace"). It sought compensation for damage to computer equipment that the defendants transported from Japan to HDS's Indiana facility.[1] Sompo settled its claims with Yusen and Pace, but NCA proceeded to trial. After a bench trial, the district court entered judgment against NCA in the amount of $74,450.84 plus costs. NCA then timely filed this appeal, and Sompo timely filed a cross appeal that challenged the district court's denial of prejudgment interest. For the reasons set forth in this opinion, we affirm the judgment of the district court.[2]

# I

## BACKGROUND

HDS purchased a number of computer parts from its manufacturer in Japan. HDS hired Yusen to arrange for their transportation from Tokyo to its facility in Indiana. Yusen contracted with NCA to transport the parts by air from Tokyo to Chicago's O'Hare Airport. HDS separately retained Pace to transport the goods from O'Hare to Indiana by truck.

On December 28, 2000, a portion of the shipment was damaged while the goods were in the process of being transferred from the loading dock to Pace's trucks at NCA's cargo facility at O'Hare. The undisputed value of the damaged cargo was at least $271,304. Sompo, a subrogated insurer, paid the insurance proceeds to HDS and commenced litigation against Pace, Yusen and NCA.

_____

[1]  The district court's jurisdiction was based on 28 U.S.C. § 1331.

[2]  Our jurisdiction is based on 28 U.S.C. § 1291.

Before trial, however, Sompo settled its claims against Pace and Yusen for $100,000 and $8,500, respectively.

Sompo then moved for summary judgment against NCA, seeking recovery under the Warsaw Convention and Montreal Protocol No. 4. The Warsaw Convention establishes a ceiling on damages recoverable against an airline, limiting NCA's potential liability to 17 Special Drawing Rights ("SDRs")[3] per kilogram, or approximately $74,450.84. NCA cross-moved for summary judgment; it sought a setoff of the $108,500 Sompo had received in settlements against the limited damages allowable under the Warsaw Convention. Such a setoff, taken from the limited liability amount, would reduce any potential judgment against NCA to $0.

The district court initially granted Sompo's motion for summary judgment, denied NCA's motion for summary judgment and entered judgment against NCA for $76,923.03. After NCA moved to amend the judgment under Federal Rule of Civil Procedure 59(e), the district court vacated the judgment. It conducted a bench trial and returned a verdict in favor of Sompo. It held that NCA was entitled to a setoff of the settlement amounts under Illinois law, but the court nevertheless refused NCA's motion to apply the setoff against the limited liability amount established in the Warsaw Convention.

---

[3] A Special Drawing Right ("SDR") is an artificial currency, established by a "basket" of global currencies (the U.S. dollar, the euro, the Japanese yen and the British pound), and published daily by the International Monetary Fund. The value of an SDR fluctuates based on the global currency market, and, under Article 22(6), it is determined "at the date of the judgment."

Rather, it applied the $108,500 setoff against Sompo's total proven damages, $271,304, reducing that amount to $167,114. The district court then entered judgment against NCA in the amount of $74,450.84 plus costs, the maximum amount allowable under the Warsaw Convention's liability cap at the time of the judgment.

NCA now seeks review of the district court's decision to apply the setoff against the total amount of proven damages rather than its limited liability amount. Sompo cross-appeals the court's denial of prejudgment interest.

## A.  The Warsaw Convention—History and Purpose

The Warsaw Convention[4] was the product of two international conferences that occurred between 1925 and 1929, while the airline industry was in its infancy. The Convention, largely a response to fears of airline carrier bankruptcy, had two primary goals: (1) to establish uniformity in the aviation industry regarding the procedural and substantive law applicable to claims arising out of international air travel; and (2) to limit air carriers' potential liability in the event of an accident.[5]

---

[4]  Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934), *reprinted in* 49 U.S.C. § 1502 (1970) [hereinafter Warsaw Convention].

[5]  *See, e.g., El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 169 (1999); *Erlich v. American Airlines, Inc.*, 360 F.3d 366, 370 (2d Cir. 2004) (citing *In re Air Disaster at Lockerbie, Scotland on Dec. 21, 1988*, 928 F.2d 1267, 1270 (2d Cir. 1991)); *see also* Paul Dempsey & Michael Milde, International Air Carrier Liability: The Montreal Convention of 1999, at 11 (2005).

The Warsaw Convention set out a scheme for limiting an air carrier's liability. It established a presumption of liability against the air carrier for accidents arising out of international air travel. Warsaw Convention, arts. 17-19. Potential plaintiffs received the benefit of presumptive liability against the carrier, but they also were subject to certain affirmative defenses and a strict damages ceiling. *Id.*, arts. 20-22. The original Convention set the liability cap at $8,500 for personal injury and approximately $20 per kilogram for damage to goods, thus protecting the airlines from the risk of catastrophic damages. *Id.*, art. 22.

As the fledgling airline industry matured, it became clear that the liability limitations of the Warsaw Convention were far too low. Largely at the insistence of the United States, the Warsaw Convention signatories reconvened in 1955 at the Hague to amend the Convention. *See* Paul Dempsey & Michael Milde, International Air Carrier Liability: The Montreal Convention of 1999, at 17 (2005). Among other alterations, the Hague Protocol increased the liability cap to approximately $16,500 for personal injuries. *Id*. at 20. The United States ultimately refused to ratify the Hague Protocol, in part because it saw the amended liability cap as still too low. *Id*. at 20-21.

Recognizing the harsh results of the unamended Warsaw Convention for potential plaintiffs, in 1965 the United States gave notice of its denunciation of the Convention. *Id*. at 29. Shortly before the denunciation was to take effect, however, a large number of private air carriers entered into an interim agreement, in which they voluntarily increased their personal injury liability limitation to $75,000. This voluntary action by the airlines became

known as the Montreal Agreement.[6] Consequently, the United States' denunciation was withdrawn.

Efforts to modernize the Convention continued, and a number of different amendments, most notably the Montreal Protocols, were developed to address formally concerns about under-compensation for plaintiffs. In 1998, the United States ratified Montreal Protocol No. 4 ("MP4"),[7] which raised the liability cap for damage to cargo to 17 SDRs per kilogram. At the time of ratification, this equaled approximately $25 per kilogram. *Id*. at 28. The MP4 went into effect in the United States on March 4, 1999.

Prior to 2003, then, a complex interplay of conventions, treaties and domestic laws governed international air carrier liability. *See* Dempsey & Milde, *supra*, at 1-2. The Montreal Convention[8] (not to be confused with the MP4 or Montreal Agreement) was the product of a United Nations effort to reform the Warsaw Convention "so as to harmonize the hodgepodge of supplementary amendments and intercarrier agreements of which the Warsaw

---

[6] Agreement Relating to Liability Limitation of the Warsaw Convention and The Hague Protocol, CAB Order E-23680 (May 13, 1966), 31 Fed. Reg. 7302 (May 19, 1966).

[7] Montreal Protocol No. 4 to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air, Signed at Warsaw on 12 October 1929, as Amended by the Protocol Done at the Hague on 28 September 1955, Sept. 25, 1975, ICAO Doc. 9148 [hereinafter MP4].

[8] Convention for the Unification of Certain Rules for International Carriage by Air, opened for signature May 28, 1999, ICAO Doc. 9740 (entered into force on Nov. 4, 2003), reprinted in S. Treaty Doc. No. 106-45, 1999 WL 33292734 (2000) [hereinafter Montreal Convention].

Convention system of liability consists." *Erlich v. American Airlines, Inc.*, 360 F.3d 366, 371 n.4 (2d Cir. 2004). In May 1999, representatives of 121 nations gathered in Montreal, Canada to negotiate and adopt a new treaty that would replace the Warsaw Convention. *Id*. At the end of a three-week conference, the delegates approved the Montreal Convention, and fifty-two countries, including the United States, immediately signed the treaty. *Id*. The new treaty "unifies and replaces the system of liability that derives from the Warsaw Convention," *id*., explicitly recognizing "the importance of ensuring protection of the interests of consumers in international carriage by air and the need for equitable compensation based on the principle of restitution." Montreal Convention, pmbl. It establishes strict liability for personal injury claims up to 100,000 SDRs, and presumptive liability without limit above that amount. Montreal Convention, art. 21. This Convention seems to have reversed one of the premises of the original Warsaw Convention, which favored the airlines at the expense of consumers. *Erlich*, 360 F.3d at 371 n.4. Nevertheless, the Montreal Convention did not alter the original Warsaw Convention goal of maintaining limited and predictable damage amounts for airlines. The United States Senate ratified the treaty on July 31, 2003, and it entered into force on September 5, 2003.

In this case, the incident giving rise to Sompo's claim took place on December 28, 2000—after the ratification of MP4 but several years before the Montreal Convention became effective in the United States. Therefore, NCA's liability here is governed by the Warsaw Convention as amended by the MP4, not by the new Montreal Convention. Under Article 18 of the Warsaw Convention, NCA

is presumptively liable for any damage sustained to goods while they are in the airline's custody. Under Article 22(2), however, NCA's potential liability is limited to 17 SDRs per kilogram of damaged goods, or approximately $74,450.84 in this case.

## B. NCA's Right to a Setoff

### 1.

Before trial, Sompo settled its claims against both Pace and Yusen for $100,000 and $8,500, respectively. NCA claims that it is entitled to a "setoff"—or, more precisely, a reduction in the judgment amount—to the extent of these settlement amounts. The district court held that a setoff was appropriate under the Illinois Joint Tortfeasors Contribution Act ("JTCA"), 740 Ill. Comp. Stat. 100/2(c). We review such conclusions of law de novo. *Johnson v. West*, 218 F.3d 725, 729 (7th Cir. 2000).

Relying on *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 175 (1999), Sompo contends that the Warsaw Convention generally preempts any domestic contribution or setoff laws. *El Al* indeed stands for the proposition that the Warsaw Convention preempts local law causes of action to the extent that they are inconsistent with the Convention. *El Al*, 525 U.S. at 161, 175. However, the Convention's preemption is not complete: "auxiliary issues" not addressed by the Convention, such as who may recover and for what harms they may be compensated, are left to domestic law. *Id.* at 169-70; *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 225 (1996) (holding that the question of whether loss of society damages may be recovered under the Warsaw Convention is an issue governed by domestic law). An air carrier's right to a

setoff or contribution from a joint tortfeasor is, similarly, incidental to the causes of action available under the Convention and therefore not subject to its limited preemption.

Sompo further submits that the Convention contains its own setoff provision, which specifically preempts other domestic setoff or contribution laws. Article 25A states:

> 1. If an action is brought against a servant or agent of the carrier arising out of damage to which this Convention relates, such servant or agent, if he proves that he acted within the scope of his employment, shall be entitled to avail himself of the limits of liability which that carrier himself is entitled to invoke under Article 22.

> 2. The aggregate of the amounts recoverable from the carrier, his servants and agents, in that case, shall not exceed the said limits.

Warsaw Convention as amended by MP4, art. 25A(1), (2). In Sompo's view, because Article 25A effectively allows an air carrier a setoff against its limitation amount for any payments made by its servants or agents, setoffs not mentioned in the provision, such as setoffs against co-defendants who are not such servants or agents, are not permitted. Consequently, Sompo argues, NCA cannot seek a setoff because Article 25A would not allow such a setoff.

Article 25A simply is not a provision designed to deal with joint and several liability. It addresses whether an airline may effectively be held liable for damages above the Convention's liability cap because of judgments against its agents. *See, e.g., Reed v. Wiser*, 555 F.2d 1079, 1083-97 (2d Cir. 1997) (examining the history of the MP4

and noting that the purpose of Article 25A was to prevent an end run around the liability limits in the Convention). Article 25A fulfills the purpose of the Convention by precluding suits against agents that could increase effectively the liability of the airlines. Joint tortfeasors, whose money flows from different sources, are not the concern of Article 25A.

Cases about preemption, such as *El Al*, note the intent of the Convention's framers to create a uniform scheme of regulation for international air carriers. The Convention's concern with uniformity focuses on protecting the airlines from catastrophic judgments and ensuring them predictability in liability. *El Al*, 525 U.S. at 157 ("Given the Convention's comprehensive scheme of liability rules and its textual emphasis on uniformity, the Court would be hard put to conclude that the Warsaw delegates meant to subject air carriers to the distinct, nonuniform liability rules of the individual signatory nations."). The Convention precludes both state causes of action and suits against agents because of their potential to erode the effectiveness of the treaty's liability limitations. The airline's relationship to joint tortfeasors is merely an "auxiliary issue," however, and uniformity in this context is, under the scheme of the Convention, less important.

The Convention also contains a savings clause which specifically notes that "[n]othing in this Convention shall prejudice the question whether a person liable for damage in accordance with its provisions has a right of recourse against any other person." Warsaw Convention, art. 30A. Thus, it appears that the Convention refused explicitly to preempt local contribution schemes. Furthermore, preemption of state laws by treaty is generally disfavored. *El Al*, 525 U.S. at 181 (Stevens, J. dissenting)

("[A] treaty, like an Act of Congress, should not be construed to preempt state law unless its intent to do is clear."); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Absent clear evidence of preemption, then, we decline to rule that state setoff and contribution laws are preempted by the Warsaw Convention.

**2.**

Having determined that the Warsaw Convention does not, by its own terms, address the issue, we must look to the law that would govern the parties' setoff and contribution rights absent the Convention. *Zicherman v. Korean Air Lines Co., Ltd.*, 516 U.S. 217, 229 (1996). Both parties agree that, in the absence of the Convention, their dispute would be governed by Illinois law; therefore, we turn to an examination of Illinois law regarding contribution and setoffs.

NCA claims a right of setoff under the Illinois Joint Tortfeasor Contribution Act ("JTCA" or "Contribution Act"), 740 Ill. Comp. Stat. 100/2(c). The JTCA provides in pertinent part:

> When a release . . . is given in good faith to one or more persons liable in tort arising out of the same injury . . . it reduces the recovery on any claim against the others to the extent of any amount stated in the release . . . or in the amount of the consideration actually paid for it, whichever is greater.

*Id*. The setoff is applied "even if the resultant judgment is thereby reduced to zero dollars." *Pasquale v. Speed Prods. Eng'g*, 654 N.E.2d 1365, 1382 (Ill. 1995). In order for the JTCA to be applicable, however, both NCA and Pace must

have been "liable in tort" for the "same injury." 740 Ill. Comp. Stat. 100/2(c). Both parties concede that the plaintiff here suffered a single, indivisible injury to its goods. Their disagreement lies in whether both parties were "liable in tort" for the purposes of the JTCA.

The purpose of the Contribution Act is to balance the equities between all culpable parties while ensuring that plaintiffs do not receive double recovery. *Doyle v. Rhodes*, 461 N.E.2d 382, 388 (Ill. 1984); *Pasquale*, 654 N.E.2d at 1381-82. In furtherance of this purpose, the Supreme Court of Illinois has construed "liability in tort" to mean "potential" tort liability, *Doyle*, 461 N.E.2d at 387, and the Illinois courts have construed broadly this "potential liability" criterion.[9] Illinois courts determine potential tort liability "at the time of the injury to the plaintiff," not when the

---

[9] *See, e.g., Giordano v. Morgan*, 554 N.E.2d 810, 814 (Ill. App. Ct. 1990) (holding that the JTCA is applicable in a contracts case); *Joe & Dan Int'l Corp. v. U.S. Fid. & Guar. Co.,* 533 N.E.2d 912, 918 (Ill. App. Ct. 1988) (noting that potential liability in tort is determined at the time of injury, not at the time of the lawsuit, and the JTCA applies even when the plaintiff has sued in contract); *Cirilo's, Inc. v. Gleeson, Sklar & Sawyers*, 507 N.E.2d 81, 83 (Ill. App. Ct. 1987) (same). The Illinois courts recognize that most other jurisdictions do not follow such a strict preference for contribution. *Kotecki v. Cyclops Welding Corp.*, 585 N.E.2d 1023, 1027 (Ill. 1991). Nevertheless, they find that their state legislature has an especially strong preference for contribution, and thus they interpret their state's Contribution Act quite liberally. *Id*. at 1027-28. As noted above, the Illinois courts have examined and reexamined *Doyle*, and they maintain that affirmative defenses, even if they lead to ultimate preemption of state law causes of action, do not negate potential liability in tort.

basis for liability is actually decided by the court. *Joe & Dan Int'l Corp. v. U.S. Fid. & Guar. Co.*, 533 N.E.2d 912, 918 (Ill. App. Ct. 1988). The JTCA "focuses, as it was intended to do, on the culpability of the parties rather than on the precise legal means by which the plaintiff is ultimately able to make each defendant compensate him for his loss." *Doyle*, 461 N.E.2d at 388.

Sompo contends that the Illinois statute is inapplicable here because neither Pace nor NCA[10] was potentially liable in tort: Sompo's complaint included claims against NCA and Pace under the Warsaw Convention and the Carmack Amendment, both of which provide their own cause of action. In support of its contention, Sompo notes that Illinois courts have looked to the pleadings to determine whether a party is potentially liable in tort.[11] Although a party's complaint is relevant, Illinois courts consistently have held that the plaintiff's own theory of liability is not conclusive for the purposes of the Contribution Act.[12] Furthermore, even if its pleadings were

---

[10] Sompo does not dispute that Yusen, the other party to this litigation that entered into a settlement agreement with Sompo, was potentially liable in tort.

[11] *See, e.g., Ill. ex rel. Hartigan v. Cmty. Hosp. of Evanston*, 545 N.E.2d 226, 230 (Ill. App. Ct. 1989) (noting that the pleadings alleged only a breach of fiduciary duty, not tort claims, and concluding that the defendant therefore was not entitled to contribution under the JTCA).

[12] *See, e.g., Giordano*, 554 N.E.2d at 814 (maintaining that "the theory under which the plaintiff sued the defendants was not dispositive as to whether both might be subject to liability in tort to plaintiff for the same injury for purposes of contribution

(continued...)

considered dispositive, that fact would not help Sompo here. Sompo brought claims against NCA and Pace under the Warsaw Convention and the Carmack Amendment; it also, however, chose to include negligence claims against NCA and Yusen in its original complaint and against Pace in its amended complaint. Under Sompo's own theory of liability, then, the defendants were potentially liable in tort.

Sompo next submits that NCA *in fact* never was potentially liable in tort because its claim arose under the Warsaw Convention, a federal liability scheme that has been held to preempt state tort claims in cases involving interstate carriers and a loss of goods. *See El Al*, 525 U.S. at 175. In its view, NCA likely could have defeated a state law negligence claim by arguing that the Warsaw Convention provides the exclusive grounds for recovery against it. *Id*. Therefore, Sompo argues, NCA was not a potential tortfeasor for the purposes of the JTCA.

The logic of the Supreme Court of Illinois, expressed in *Doyle*, 461 N.E.2d 382, is helpful to our analysis. In *Doyle*, the defendant employer maintained that its statutory immunity under the Illinois Workers' Compensation Act also immunized it from a contribution claim under the JTCA; because the state Workers' Compensation Act preempted other state law tort claims, the employer maintained that it had no potential liability in tort.

---

[12] (...continued)

between them"); *Joe & Dan*, 533 N.E.2d at 918 (noting that potential liability in tort is determined at the time of injury, not at the time of the lawsuit); *Cirilo's,* 507 N.E.2d at 83 (holding that the Contribution Act applied even when the liability arose out of contract claims rather than tort claims).

*Id*. at 384. The court rejected this argument, concluding that the defendant was *potentially* liable in tort at the time of the incident, even though any common law tort action ultimately would have been preempted by the workers' compensation regime. *Id*. at 388. It reasoned that, although preemption is a defense to any tort action brought by an employee for a work-related incident, it is merely an affirmative defense, not an outright bar to liability. *Id*. at 386-87. In its view, an employer could make the strategic decision to defend against an employee's tort claim on its merits rather than invoke the protections of the workers' compensation scheme, perhaps in the hopes that the jury would find the evidence of negligence lacking. In such a case, the employer's legal exposure would be based on liability in tort. *Id*. Such "potential liability" was enough for the Supreme Court of Illinois to find the JTCA applicable. *Id*.[13]

The reasoning in *Doyle* may be applied in this case. As we noted earlier, the Warsaw Convention preempts state tort laws to the extent that those state rules conflict with its own regulatory structure. *See El Al*, 525 U.S. at 175 ("[T]he Convention's preemptive effect is clear:

---

[13] *Doyle* was reaffirmed recently by the Illinois Supreme Court in *Virginia Surety Co., Inc. v. N. Ins. Co. of New York et al.*, 866 N.E.2d 149, 154-55, 160 (Ill. 2007); *see also Unzicker v. Kraft Food Ingredients Corp.*, 783 N.E.2d 1024, 1033 (Ill. 2002) (explicitly reaffirming *Doyle*); *Braye v. Archer-Daniels-Midland Co.*, 676 N.E.2d 1295 (Ill. 1997) (holding that the Workers' Compensation Act is in the nature of an affirmative defense that may be waived by the employer, and therefore the defendant was still potentially liable in tort); *Geise v. Phoenix Co. of Chicago, Inc.*, 639 N.E.2d 1273 (Ill. 1994) (same).

The treaty precludes passengers from bringing actions under local law when they cannot establish air carrier liability under the treaty."). However, this preemption is limited. Article 24 provides: "In the carriage of cargo, any action for damages, however founded, *whether under this Convention or in contract or in tort or otherwise*, can only be brought subject to the conditions and limits of liability set out in this Convention . . . ." (emphasis added). Article 24 expressly contemplates that an action may be brought in contract or in tort. The liability limitation provisions of the Warsaw Convention simply operate as an affirmative defense.[14] Accordingly, the Supreme Court of Illinois' reasoning in *Doyle* suggests that the limited preemption in the Warsaw Convention does not preclude the application of the JTCA here.

Although the parties do not reference it, we acknowledge that we previously have held that the JTCA did not apply to a party sued under the Carmack Amendment because the federal statute "preempt[ed] the field formerly occupied by common law theories of liability." *N. American Van Lines v. Pinkerton Sec. Sys.*, 89 F.3d 452, 458 (7th Cir. 1996). Nevertheless, we found that decision to be consistent with the Illinois Supreme Court's analysis in *Doyle* because, in *North American*, liability could be premised solely on the Carmack Amendment. The plaintiff

---

[14] *See, e.g., Craddock Intern. Inc. v. W.K.P. Wilson & Son, Inc.*, 116 F.3d 1095, 1105-06 (5th Cir. 1997) (noting that the liability limitations in the Warsaw Convention must be pleaded as an affirmative defense); *Distribuidora Dimsa v. Linea Aerea Del Cobre S.A.*, 976 F.2d 90, 93 (2d Cir. 1992) (referring to the liability limitations in the Warsaw Convention as an affirmative defense).

there "was foreclosed from suing in tort by the terms of the Carmack Amendment, which preempts the field formerly occupied by common law theories of liability." *Id*. at 458. Accordingly, there was no need for the defendant to plead the liability limitations in the Carmack Amendment as an affirmative defense: "the contract defined both its liability and [the plaintiffs'] right to relief." *Id*. at 459.

Notably, we emphasized in *North American* that the Carmack Amendment was unique. *Id*. at 458. It was intended by Congress to be a consumer-friendly law, establishing its own mechanism for contribution and "relieving shippers of the burden of determining which of the several carriers handling interstate shipments bears the blame for loss or damage under diverse state laws." *Id*. at 457. The Warsaw Convention, on the other hand, privileges the air carrier and provides it with a partial affirmative defense to claims by potential plaintiffs. Unlike the Carmack Amendment, the Warsaw Convention does not have its own apportionment system, and it expressly contemplates the use of state law to fill in the interstices. *See* Warsaw Convention, art. 24 ("[A]ny action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and limits of liability set out in this Convention without prejudice to the question as to who are the persons who have the right to bring suit and what are their respective rights."); art. 30A ("Nothing in this Convention shall prejudice the question whether a person liable for damage in accordance with its provisions has a right of recourse against any other person."). The Warsaw Convention therefore is particularly suited to the application of state setoff and contribution schemes.

Accordingly, the Carmack Amendment and the Warsaw Convention are distinguishable, and our application of *Doyle* here is consistent with our prior opinion in *North American*.

Furthermore, the two other circuit courts that have addressed the question have concluded that a right of setoff or contribution is available for the airlines in claims arising under the Warsaw Convention. *See In re Air Crash at Little Rock, Arkansas on June 1, 1999,* 291 F.3d 503, 516-17 (8th Cir. 2002) (examining the question of tortfeasor contribution under the Warsaw Convention, and directing the district court to allow the defendant airline to file a third-party claim for contribution against the United States); *Piamba Cortes v. American Airlines, Inc.*, 177 F.3d 1272, 1305 (11th Cir. 1999) (assuming that a state law claim for contribution was proper under the Warsaw Convention). Our conclusion that the Warsaw Convention is compatible with a state law contribution scheme, therefore, is consistent with the interpretation of other circuits.

Although we conclude that a claim for liability under the Warsaw Convention is compatible with a claim for contribution or setoff under the JTCA, our inquiry does not end there. A party seeking contribution or a right of setoff under the JTCA must show that the plaintiff potentially had "a cause of action sounding in tort against *both* the party seeking contribution and the party from whom contribution is sought." *N. American*, 89 F.3d at 456 (emphasis added). To seek a setoff under the JTCA, then, NCA must show that Sompo could have brought a claim sounding in tort against Pace and/or Yusen as well as against the air carrier. Sompo does not dispute that Yusen was potentially liable in tort here; accordingly, NCA is

entitled to a setoff of the $8,500 Yusen paid to Sompo in the settlement. Pace, however, was potentially liable only under the Carmack Amendment, a fact that, as we have already discussed, precludes NCA from seeking a setoff of its payments under the JTCA. *See N. American*, 89 F.3d at 458.

Even if Pace is not a potential "tortfeasor" within the meaning of the JTCA, however, NCA can claim a setoff right based on Illinois common law. *See, e.g.*, *Maher v. Chicago Park Dist.*, 645 N.E.2d 295, 297 (Ill. App. Ct. 1994) (noting that the JTCA is not the sole source of a setoff right, and a setoff right existed at common law); *Hentze v. Unverfehrt*, 604 N.E.2d 536, 541 (Ill. App. Ct. 1992) (holding that a right of setoff is implied in contract cases, even if not statutorily encompassed by the JTCA); *Johnson v. Belleville Radiologists, Ltd.*, 581 N.E.2d 750, 753 (Ill. App. Ct. 1991) ("The provision for a setoff contained in the Contribution Act is not the source of the defendants' right to a setoff; it is merely a codification of that right. Defendants were entitled to a setoff at common law."). Sompo does not dispute the existence of this common law right, and therefore we conclude that NCA is entitled to a setoff of the entire settlement amount.

In sum, we hold that the Illinois Joint Tortfeasors Contribution Act is not preempted by the Warsaw Convention, and that NCA is entitled to a setoff of the entire amount of the settlement under the JTCA and Illinois common law. We next must determine whether the setoff should be taken from the capped judgment amount ($74,450.84), reducing Sompo's award to zero, or from the total proven damages amount ($271,304), granting Sompo the maximum damages allowable under the Convention.

**B. To Which Amount Does the Setoff Apply?**

The district court found that the plaintiff in this case had sustained at least $271,304 in proven damages. Applying Illinois contribution law, it then reduced that amount by $108,500, the amount that Sompo had received from Pace and Yusen in settlements. The court therefore concluded that Sompo was entitled to $162,804 in damages. As the Warsaw Convention capped NCA's liability at $74,450.84, however, the district court awarded Sompo only $74,450.84.

On appeal, NCA contests the district court's method of calculation. It submits that Sompo's $108,500 settlement with Pace and Yusen instead should have been applied against the $74,450.84 limited liability figure, effectively reducing NCA's liability to $0. Sompo, on the other hand, contends that the settlement amount correctly was deducted from its total amount of proven damages, or $271,304, leaving NCA responsible for the full amount permissible under the Warsaw Convention. We review de novo the district court's decision to apply the setoff to the total damage amount rather than to the reduced liability amount. *See Johnson v. West*, 218 F.3d 725, 729 (7th Cir. 2000).

The JTCA provides that a plaintiff's settlement with a joint tortfeasor "reduces the recovery on any claim" against a non-settling defendant. 740 Ill. Comp. Stat. 100/2(c). In NCA's view, the term "recovery" means the "amount finally collected" by a plaintiff. Black's Law Dictionary 1276 (6th ed. 1990). Without citing legal authority, NCA contends that the plain meaning of this statute therefore requires the court to apply the setoff against the amount finally collectable by the plaintiff—here, the $74,450.84 ultimately recoverable under the Warsaw Convention.

In practice, however, NCA's so-called "plain meaning" reading of the statute makes little sense. As the district court aptly noted, "[i]f the setoff were to be deducted from the 'amount finally collected' by a plaintiff, . . . the latter would no longer be the amount 'finally collected.' Applying the 'plain meaning' leads to an absurd result." *Sompo Japan Ins., Inc. v. Nippon Cargo Airlines Co.,* No. 02 C 9311, 2004 WL 2931282, at *9 (N.D. Ill. Dec. 15, 2004).[15]

Contrary to NCA's defendant-centered approach, an Illinois court has said that the JTCA requires a setoff so that "a payment by one tortfeasor diminishes a plaintiff's claim against all other tortfeasors responsible for the same harm." *Hentze*, 604 N.E.2d at 541. The court focused on the plaintiff's proven damages, not the defendant's ultimate liability: "The underlying current . . . is that a plaintiff's claimed damages are to be reduced by any payments he has received in compensation for the same harm or injury." *Id*.

The purpose underlying the JTCA is the "long-recognized principle in Illinois that a plaintiff shall have only one satisfaction for an injury." *Pasquale*, 654 N.E.2d at 1381.

---

[15] Indeed, NCA's definition of "recovery" is not the only possible definition of the term. Black's Law Dictionary also defines the term "recovery" as, "in its most extensive sense, the restoration or vindication of a right." Black's Law Dictionary 1147 (5th ed. 1979). According to this definition, "recovery on a claim" could mean the restoration or vindication of the plaintiff's total damages—in short, making the plaintiff whole. Such a definition comports with the district court's interpretation of the Act, which would focus on vindication of the plaintiff's claim rather than the amount the defendant ultimately pays.

The setoff right is plaintiff-centered, rather than focused on the unique characteristics of the defendant. *See Maher v. Chicago Park Dist.*, 645 N.E.2d 295, 298 (Ill. App. Ct. 1994) (noting that a defendant may receive a setoff in order to prevent a plaintiff from receiving double recovery for the same injury, irrespective of the defendant's actions). Therefore, applying the setoff to the plaintiff's total damages, rather than the defendant's total liability, comports with the intent of the statute.

Such a result, as NCA suggests, conceivably could be perceived as allowing "double recovery" for Sompo, for although only NCA was held responsible for the accident, Sompo recovered from multiple parties. Indeed, Sompo recovered more in its settlement with Pace than it probably would have been awarded had all the parties gone to trial. This is not, however, the double recovery about which the JTCA is concerned. Presumably, the settlement amount recovered from Pace and Yusen was discounted by those parties to reflect their estimation of the probability that they would be found responsible for the accident. Although, in hindsight, it appears that the settling defendants paid far more than their legal liability, avoiding the risk and the cost of litigation apparently was worth the price of settlement for Pace and Yusen. Courts do not second-guess such decisions absent evidence of bad faith. *Cleveringa v. J.J. Case Co.*, 549 N.E.2d 877, 880 (Ill. App. Ct. 1990). The purpose of the setoff statute is defeated by a recovery from this type of settlement only if the plaintiff's aggregate recovery is greater than his actual proven damages.

Here, Sompo receives no unfair windfall by recovering from both Pace and NCA. Even with recovery from both, Sompo is still substantially under-compensated. The dis-

trict court found that Sompo's total damages were at least $271,304. The Pace/Yusen settlement of $108,500 left Sompo with $162,804 in unpaid damages. "Given that NCA's liability is limited to $74,450.84," the district court noted, "Sompo will not recover even one full compensation for its injuries, much less 'double recovery.'" *Sompo*, 2004 WL 2931282, at *9.

On the other hand, NCA would receive a hefty windfall were we to accept its interpretation of the JTCA. NCA asks that we apply the amount of Pace's and Yusen's settlements to its already-capped liability amount, reducing the judgment against it to zero and leaving Sompo with $162,804 in uncompensated damages. Under NCA's interpretation, despite the fact that NCA was found by the district court to have been the sole party responsible for the loss, it would be free from paying any damages. The entire burden would fall upon Pace, Yusen and the plaintiff—all innocent parties. Surely this is not the result required by the JTCA, an act intended to properly distribute losses among culpable parties. *See Doyle*, 461 N.E.2d at 386, 388 (stating that the JTCA was designed to "reach anyone who is culpable regardless of whether they have been immunized from a direct tort action by some special defense or privilege," and to enforce "an equitable duty to share liability for the wrong done"); *see also Jansen v. Aaron Process Equip. Co.*, 149 F.3d 603, 609 (7th Cir. 1998) (noting that "the culpable tortfeasor rather than the injured victim will bear the financial responsibility" when faced with an inequitable distribution of loss).

Such a result does not contradict the purposes of the Warsaw Convention. Certainly, one of the leading purposes of the original Warsaw Convention was to limit the potential liability of air carriers. However, beginning

with the Montreal Agreement and MP4, and culminating in the most recent Montreal Convention,[16] the modern Warsaw regime has been driven by an attempt to better balance the interests of air carriers and potential plaintiffs. This goal is achieved by limiting air carriers' potential liability to predictable, non-catastrophic damages and also by preserving a plaintiff's right to recover its losses up to a certain amount. Applying the setoff to the total amount of damages in this case results in a greater amount of liability for the airline than if the statute had directed us to take the reduction from the capped amount. Even when applying the setoff to the total damages amount, however, the airline retains the protection of the Warsaw Convention's liability cap and therefore is assured that its liability is predictable and limited. Our interpretation of the setoff rule in no way increases the air carriers' risk of being subjected to unpredictable or catastrophic damages.

Accordingly, we conclude that the judgment of the district court was correct. NCA is entitled to a setoff of the settlement amounts, but the amount must be subtracted from Sompo's total proven damages rather than from NCA's limited liability under the Warsaw Convention. Because Sompo's post-settlement uncompensated damages far exceeded Sompo's liability under the Warsaw Convention, the award of $74,450.84 was correct.

---

[16] We recognize, of course, that the Montreal Convention is not directly applicable to the instant case, as it was ratified after the events in question. Nevertheless, the trend toward increased protection for consumers may inform our interpretation of the Warsaw Convention, as amended by MP4, in this case.

**D. Prejudgment Interest**

In its cross-appeal, Sompo asks that we award prejudgment interest on the judgment amount. The Supreme Court has not addressed the availability of prejudgment interest under the Warsaw Convention. This court, however, previously has held that prejudgment interest is not appropriate under the terms of the treaty. *Deere & Co. v. Deutsche Lufthansa Aktiengesellschaft*, 855 F.2d 385 (7th Cir. 1988).

In *Deere*, we held that the Warsaw Convention's goal of fixing uniform limits on damages for airlines was "inherently incompatible with full compensation to all customers." *Id.* at 392. Consequently, making aggrieved airline customers whole "was not a primary purpose of the Convention." *Id.* By contrast, "[t]he preeminent purpose of the Convention was to fix definite and uniform limits on the cost to airlines," and allowing additional prejudgment interest would contradict this goal. *Id.* at 391.[17]

Sompo suggests that *Deere* was decided before the Montreal Protocol took effect in the United States, and thus it is not necessarily a binding interpretation of current law. Although the *Deere* opinion was written before MP4 became effective, the court was not unaware of the existence of the law. In fact, we addressed the Montreal Protocol as persuasive authority in interpreting the Con-

---

[17] This decision comported with the Second Circuit's holding in *O'Rourke v. Eastern Air Lines*, 730 F.2d 842 (2d Cir. 1984), although it is in conflict with decisions in the Fifth Circuit and the Ninth Circuit. *See Motorola, Inc. v. Fed. Express Corp.*, 308 F.3d 995 (9th Cir. 2002); *Domangue v. E. Airlines, Inc.*, 722 F.2d 256 (5th Cir. 1984).

vention. *Id*. at 392. We specifically determined that MP4's additional goals of speedy settlement of claims, as well as some limited additional protection of the consumer, were not significantly served by awarding prejudgment interest. *Id*. at 392. As illustrated in this case, because airlines are willing to incur substantial fees to litigate the issues of damages, "prejudgment interest would constitute only a minor deterrent to litigation-caused delays in payment." *Id*. The overarching goal of the Warsaw Convention, to fix an airline's potential damages at a predictable level, would not be served by allowing discretionary prejudgment interest.

Sompo has failed to meet its burden of persuading us that, despite the doctrine of stare decisis and precedent, we ought to overhaul or modify our holding in *Deere*.

### Conclusion

For the reasons explained above, we affirm the judgment of the district court.

AFFIRMED